IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br>    Plaintiff,<br>v.<br>ISTVAN ATTILA KOPACZ,<br>    Defendant. | Case No. 19-cr-00394-CRB-3<br><br>**ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL** |

On September 20, 2022, based on evidence of unauthorized withdrawals of $800 each from five First Republic Bank ("FRB") accounts through the prior use of a skimming device, a jury convicted Istvan Atilla Kopacz ("Kopacz") of three charges: using a counterfeit access device in violation of 18 U.S.C. § 1029(a)(1) (Count Two); using an unauthorized access device in violation of 18 U.S.C. § 1029(a)(2) (Count Three); and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) (Count Twelve). He now moves for a judgment of acquittal. Mot. (dkt. 120).

Kopacz argues that: (1) the government failed to establish that his conduct affected interstate commerce, a required element of each count; and (2) the government failed to establish that Kopacz knew that the accounts he accessed belonged to real people, a required element of aggravated identity theft. Because the government's evidence was sufficient for the jury to find each of these elements satisfied, the motion is denied.

**I.    BACKGROUND**

Kopacz was initially indicted in August 2019. See Indictment (dkt. 1). Kopacz was charged with violations of 18 U.S.C. § 1029(b)(2) (Conspiracy to Commit Access Device Fraud); 18 U.S.C. 1029(a)(1) (Access Device Fraud); 18 U.S.C. 1029(a)(2) (Access

Device Fraud) and 18 U.S.C. § 1028A (Aggravated Identity Theft). Id. In August 2022, the government dismissed the conspiracy count against Kopacz, see dkt. 85, and trial on the remaining counts began on September 19, 2022. See dkt. 102. The next day, at the conclusion of the trial, the jury convicted Kopacz on all three counts. See Jury Verdict (dkt. 111). Kopacz moved for a judgment of acquittal at the close of trial, and the parties subsequently briefed the motion. See Trial Tr. Vol. 2 (dkt. 120-3) at 317:5–12; Mot.; Opp'n (dkt. 125); Reply (dkt. 127). The Court finds this motion suitable for resolution without oral argument and therefore VACATES the motion hearing currently set for November 29. The Court will proceed with sentencing on that day.

## II.  LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Evidence is insufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt." United States v. Nevils, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (emphasis omitted) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Thus, the Court "may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." Id. at 1164. "Therefore, in a case involving factual disputes and credibility determinations," the Court "'must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" United States v. H.B., 695 F.3d 931, 935 (9th Cir. 2012) (quoting Nevils, 598 F.3d at 1164). "Circumstantial evidence 'can be used to prove any fact,' although 'mere suspicion or speculation does not rise to the level of sufficient evidence.'" United States v. Dinkane, 17 F.3d 1192, 1196 (9th Cir. 1994) (quoting United States v. Stauffer, 922 F.2d 508, 514 (9th Cir. 1990)). "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." Id. (quoting United States v. Mares, 940 F.2d

2

455, 458 (9th Cir. 1991)).

## III.   DISCUSSION

### A.   All Counts: Affecting Interstate Commerce[1]

Kopacz argues that the government did not establish that his conduct affected interstate commerce because it relied on a single witness to do so: Bryan Jang, Vice President of Corporate Security for FRB, which hosts the bank accounts of the five victims in this case.  Because FRB contracts with another company, Fiserv, to process ATM transactions for its customers, Kopacz contends that Jang was not competent to testify to the location of Fiserv's servers, which were the basis for the government's proof that the transactions affected interstate commerce.  The government argues that, because it established that Jang had "general" knowledge of the location of Fiserv's servers based on his "background, training, and experience" at FRB and prior, that a rational jury could (and did) credit Jang's testimony and find that this element had been proven.  The Court agrees.

At trial, Jang provided ample basis for the jury to credit his testimony, because he showed a thorough general understanding of how FRB processed ATM transactions, including its relationship with Fiserv.  Prior to joining FRB in 2015, Jang testified to having spent 25 years in federal law enforcement investigating financial crimes.  Trial Tr. Vol. 1 (dkt. 120-2) at 151:1–17.  He testified to his experience investigating fraudulent withdrawals from ATMs, having participated in "[o]ver a hundred" investigations.  Id. at 168:4.  Nevertheless, since joining FRB and moving up through the ranks, his "duties have expanded tremendously" from investigating financial crimes.  Id. at 151:23–152:6.  Jang described his current responsibilities as "provid[ing] for the safety and security of [FRB's] people, property, assets and brand."  Id. at 150:16–25, 152:1–3.  Throughout his testimony,

---

[1] Both Count Two (use of a counterfeit access device) and Count Three (use of an unauthorized access device) required the government to prove beyond a reasonable doubt that Kopacz's alleged conduct "affect[ed] interstate or foreign commerce."  18 U.S.C. § 1029(a).  Because Count Twelve (aggravated identity theft) required the government to prove that Mr. Kopacz's alleged possession or use of the means of identification of another was "during and in relation to" access device fraud, see 18 U.S.C. § 1028A, Kopacz's conviction on Count Twelve must also fall if the Court finds that the government has not established this element.

1  Jang clearly described the ways FRB customers obtain debit cards and PIN numbers, how
2  ATM withdrawals from FRB accounts work, and his team's investigations of fraudulent
3  ATM withdrawal schemes.

4  As part of his testimony explaining how FRB ATM transactions worked, Jang
5  described the bank's relationship with Fiserv.  Jang explained that FRB ATM transactions
6  necessarily go through a "third-party payment or transaction processor," and that as of July
7  2018, FRB's third-party processor was Fiserv.  Id. at 157:6–16.  Jang further testified that
8  he understood that Fiserv was located in New Jersey, and that its servers were also located
9  in New Jersey.  Id. at 157:22–158:17.  As a result, when an FRB customer's ATM
10 transaction was initiated, it would get "routed to Fiserv" in New Jersey, and then back to
11 FRB for approval.  Id. at 158:6–17.  Further, during its investigation, FRB generated a
12 "transaction journal," which contained data regarding potentially fraudulent transactions,
13 including the "journal date," or the date each transaction was "initiated or requested."  Id.
14 at 164:19, 165:22–166:4.  Jang explained that the journal date was given in Eastern Time,
15 because "that's the time that the transaction hit the Fiserv servers in New Jersey."  Id. at
16 166:6–7.

17 On cross examination, Kopacz's counsel pressed Jang about his personal
18 knowledge of FRB's network hardware, Fiserv's software, and the precise transactions at
19 issue.  Jang testified that he had not examined FRB's network hardware nor Fiserv's
20 software, as he is not an information technology specialist for FRB, nor does he work at
21 Fiserv.  Id. at 180:1–181:2.  During his investigation of withdrawals, Jang did not
22 personally "confirm how FRB's ATM network systems were operating at the time," nor
23 did he ask Fiserv to do the same.  Id. at 181:3–9.  When asked, Jang confirmed that he did
24 not have "personal knowledge" of where the precise server that processed each of the five
25 transactions at issue was located.  Id. at 181:10–182:10.  Jang's testimony was "simply that
26 as a general matter . . . FRB's vendor, Fiserv, has servers in Texas and New Jersey."  Id. at
27 182:11–14.  On redirect, Jang confirmed that, to his knowledge, all servers "used by First
28 Republic and operated by Fiserv [are] located outside the state of California," but he had

4

not personally witnessed the Fiserv servers receiving the transmission of the five transactions at issue. Id. at 188:1–12.

Kopacz argues that a rational jury could not have accepted Jang's testimony as to the location of Fiserv's servers and whether these transactions were sent to them, because he showed only that he knew "as a general matter" that Fiserv's servers were located in New Jersey and Texas, not California. Id. at 182:11–14. But more specialized personal knowledge of the specific transactions at issue is not required for the jury to conclude that the interstate commerce element was satisfied. In United States v. Thompson, an appeal of a conviction for bank robbery, the defendant argued that the jury improperly credited the testimony of a restaurant manager, because he became manager after the date of the robbery in question. 559 F.2d 552, 553–54 (9th Cir. 1977). The Ninth Circuit held that because the manager was testifying to "what normal company procedures were" on the date of the robbery, the manager had "ample personal knowledge to testify on that subject." Id. at 554. Similarly, Jang, who has investigated security breaches for FRB for seven years and thus has "ample personal knowledge" of the technical workings of its systems, could testify to FRB's relationship to Fiserv and the general location of Fiserv's servers without having precise personal knowledge of the location of the servers and when the transactions at issue reached them. See also In re Kaypro, 218 F.3d 1070, 1075 (9th Cir. 2000) ("Griesbach's five-year tenure as Arrow's credit manager lends support to his claim of 'personal knowledge' of industry practice."); Stuart v. UNUM Life Ins. Co. of Am., 217 F.3d 1145, 1155 (9th Cir. 2000) (finding that a company's Vice President for Corporate Services has "ample personal knowledge" to testify regarding the company's employee insurance plan). A rational juror could have found that the government proved that the transactions affected interstate commerce beyond a reasonable doubt by crediting Jang's testimony.

### B. Aggravated Identity Theft: Knowledge Element

Kopacz further argues that the government presented insufficient evidence of Kopacz's knowledge that each of the ATM accounts that he accessed belonged to another

person, as required to prove aggravated identity theft. See 18 U.S.C. § 1028A; Flores-Figueroa v. United States, 556 U.S. 646, 657 (2009). While Kopacz is correct that knowledge is an element of the offense, this is a "classic case of identity theft," where "intent is generally not difficult to prove." Flores-Figueroa, 556 U.S. at 656 ("For example, where a defendant has used another person's identification information to get access to that person's bank account, the Government can prove knowledge with little difficulty."). Courts in this Circuit and others have held that the government need not present direct evidence to prove this element. See, e.g., United States v. Doe, 842 F.3d 1117, 1120 (9th Cir. 2016); see also United States v. Meme, 832 F. App'x 603, 607 (11th Cir. 2020) ("[B]oth the circumstances in which an offender obtained a victim's identity and the offender's later misuse of that identity can shed light on the offender's knowledge about that identity." (quoting United States v. Delva, 922 F.3d 1228, 1249 (11th Cir. 2019)). Types of circumstantial evidence held to be sufficient include testimony from the source of the identifying information explaining their procedures, Doe, 842 F.3d at 1121; and the defendant's prior experience with those procedures, see United States v. Clark, 668 F.3d 568, 574 (8th Cir. 2012); Doe, 842 F.3d at 1122.

At trial, the government presented the following evidence: (1) that FRB only issued ATM cards and PINs to real people (even if the account was associated with a business), Trial Tr. Vol. 1 at 152:16–154:4; (2) that each of the victims of the scheme were real people who testified to obtaining their ATM cards and PINs from FRB, id. at 193:1–25, 195:4–12, 204:18–20, 205:19–25; Trial Tr. Vol. 2 at 248:5–20, 249:11–22, 257:20–258:9, 263:23–25, 264:21–265:3; and (3) that a man who resembled Kopacz used the five victims' bank account information and PINs to withdraw uniform amounts from their accounts over a period of two days, see, e.g., Trial Tr. Vol. 2 at 231:25–232:3; 313:1–315:11. Because "a trier of fact can rely on common sense" when deciding this element, it was reasonable for the jury to impute knowledge of FRB's requirement that only an actual person may receive a debit card and PIN to Kopacz through his competent use of the ATMs to withdraw funds from the victims' FRB accounts. See Doe, 842 F.3d at 1122

(quoting United States v. Gomez-Castro, 605 F.3d 1245, 1249 (11th Cir. 2010)); see also Clark, 668 F.3d at 574 ("A reasonable juror could infer that Clark, being a bank account holder and prior perpetrator of identity theft, knew that banks open accounts for, and give credit to only real people."); Meme, 832 F. App'x at 607 (finding that evidence of the defendant's "participation in a scheme using stolen debit-card numbers to make unauthorized ATM withdrawals" and the defendant's pattern of withdrawals allowed a jury to reasonably conclude that he knew those numbers belonged to real people).

Therefore, a rational jury could and did conclude that Kopacz knew that the bank accounts in question belonged to real people.

## IV. CONCLUSION

For the foregoing reasons, the motion is DENIED.

**IT IS SO ORDERED.**

Dated: November 17, 2022

_____
CHARLES R. BREYER
United States District Judge